1   Wesley M. Griffith, SBN 286390
    CUTTER LAW P.C.
2   401 Watt Avenue
    Sacramento, CA 95864
3   Telephone: (916) 290-9400
    Facsimile: (916) 588-9330
4   E-mail: wgriffith@cutterlaw.com

5   F. Peter Silva II, SBN 348070
    David A. McGee (*pro hac vice* to be filed)
6   TYCKO & ZAVAREEI LLP
    2000 Pennsylvania Avenue, NW, Suite 1010
7   Washington, District of Columbia 20006
    Telephone: (202) 973-0900
8   Facsimile: (202) 973-0950
    E-mail: psilva@tzlegal.com
9            dmcgee@tzlegal.com

10  Jeffrey Newsome (*pro hac vice* to be filed)
    VARNELL & WARWICK
11  400 N. Ashley Drive, Suite 1900
    Tampa, Florida 33602
12  Telephone: (352) 753-8600
    Facsimile: (352) 504-3301
13  E-mail: jnewsome@vandwlaw.com

14  Counsel for Plaintiffs and the Proposed Class

15          **UNITED STATES DISTRICT COURT**
16          **SOUTHERN DISTRICT OF CALIFORNIA**

17
    KAIDI WU and JUHYUN SO on         Case No. **'25CV1090 AGS BLM**
18  behalf of themselves and all others
    similarly situated,                CLASS ACTION COMPLAINT FOR
19                                     INJUNCTIVE AND MONETARY
                                       RELIEF
20      Plaintiffs,
                                       Jury Trial Demanded
21  vs.

22  GREYSTAR REAL ESTATE
    PARTNERS, LLC dba GREYSTAR,
23  LLC and GREYSTAR
    CALIFORNIA, INC., dba
24  GREYSTAR,
    Defendants.
25

26

27

28

-1-

CLASS ACTION COMPLAINT

## I.     INTRODUCTION

1.     California faces a massive housing crisis, with some of the highest rental rates and incidences of homelessness in the United States.

2.     A major cause of the California housing crisis is corporate owned and managed rental properties. These corporate properties drive down supply, drive up prices, and put profits over people.

3.     One of the corporate landlords exacerbating California's housing crisis is Defendant Greystar California, Inc. (together with Greystar Real Estate Partners, LLC, "Greystar" or "Defendants"), the largest residential landlord in the United States.

4.     Greystar manages over 700,000 rental units, directly owns more than 100,000 additional rental units, and has over $75 billion in managed assets.

5.     To support these massive operations, Greystar has over 20,000 employees, including sophisticated marketing and pricing teams.

6.     Renters such as Plaintiffs and the Class depend on landlords and their affiliates, such as Greystar, to be truthful about what fees can be charged under California law and do not expect that they will be charged unlawful fees, such as separate fees for pest control and trash services in addition to rent.

7.     Many residential property companies and their affiliates do not charge their tenants separate fees for pest control or trash services knowing that, under California law, such costs must be absorbed by the landlord and included in the rent. These extra hidden fees prevent consumers, such as Plaintiffs and the proposed Class, from engaging in meaningful comparison shopping between apartments when deciding where to live, which also stifles competition in the rental market.

8.     By shifting the costs of pest control and trash services to tenants, Greystar unlawfully increases its profits from every rental unit where these fees are charged.

CLASS ACTION COMPLAINT

9.      To make matters worse, Greystar has intentionally and strategically engaged in "bait-and-switch" and "drip pricing" sales tactics to make their units appear cheaper than they actually are and imposes costs that are Greystar's responsibility on to tenants after the tenant has expended significant resources in selecting an apartment.

10.     Put simply, Greystar's tactics make it impossible to actually rent from Greystar for the advertised prices and unlawfully drive-up housing costs across California.

11.     Specifically, in addition to the advertised cost of rent, Greystar adds additional mandatory monthly fees that can add up to hundreds of dollars per month per tenant, including mandatory add-on fees that Greystar describes as "service fees," "administrative fees," "trash fees," and "pest control fees," among others (collectively, "Junk Fees").

12.     However they are characterized, the Junk Fees are simply mandatory additional charges that are actually part of the rental price for the units.

13.     There is no way for the tenants to avoid these Junk Fees, and as a result, there is no way for tenants to actually rent their units for the advertised and agreed upon rental prices.

14.     Given the prevalence of bait-and-switch tactics and junk fees, effective July 1, 2024, California expressly banned the practice.

15.     Specifically, the Honest Pricing Act, S.B. 478, amended California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.,* ("CLRA") to prohibit "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges." Cal. Civ. Code § 1770(a)(29)(A).

16.     The Honest Pricing Act further confirmed that bait and switch advertising and drip pricing were already illegal in California, providing that the "act is intended to *specifically prohibit drip pricing*, which . . . like other forms of bait and switch advertising, is prohibited by existing statutes, including the Unfair

-3-

Competition Law . . . and the False Advertising Law." Cal. SB 478 at § 1(a)-(b) (emphasis added).

17.     Plaintiff Juhyun So's case is instructive. In November 2022 Plaintiff So viewed a Greystar apartment complex, the Vox, located at 3333 La Cienega Blvd, Los Angeles, CA 90016 online. The amount listed for the rent was $3,434. On November 28, 2022, Plaintiff So paid a $106.00 application fee to apply to be a tenant of Greystar at the Vox. Also on November 28, 2022, Plaintiff So was required to pay a $300 holding fee for Greystar to hold the apartment so that So could schedule a viewing.

18.     On December 4, 2022, Plaintiff So did a walk through at the Vox and was provided with a breakdown of the monthly apartment costs, which appeared as follows:

*The following is a breakdown of your monthly rental charges, deposits, and move-in fees:*

| MONTHLY CHARGES | | DEPOSITS | | FEES | |
|---|---|---|---|---|---|
| RENT | $3,434.00 | SECURITY DEP. | $750.00 | ADMIN | N/A |
| SCEP FEE | $2.83 | PET DEPOSIT | 0.00 | APPLICATION | $106.00 |
| PARKING | N/A | ADDITIONAL DEPOSIT | 0.00 | PET | N/A |
| PET RENT | N/A | OTHER | 0.00 | OTHER | N/A |
| OTHER | N/A | OTHER | 0.00 | OTHER | N/A |
| OTHER | N/A | OTHER | 0.00 | OTHER | N/A |
| OTHER | N/A | TOTAL | $750.00 | OTHER | N/A |
| OTHER | N/A | | | OTHER | N/A |
| TOTAL | $3,436.83 | | | TOTAL | $106.00 |

19.     Greystar again reaffirmed that the monthly cost of the apartment Plaintiff So saw online was $3,434.00 per month, plus an application fee of $106 and a "SCEP fee" of $2.83 per month.

20.     So decided to go forward with renting the apartment based on these terms.

21.     On December 11, 2022, Plaintiff So was provided with a formal lease agreement. The new lease, however, included additional, previously undisclosed fees, which included the following mandatory fees: $20 "New Trash account fee,"

$5.00 "Trash Administrative fee," and an additional trash fee of $35 per month. In addition, Plaintiff So was presented with a $3 per month pest control fee.

22.    For a 1-year span, Plaintiff So would be required to pay at least $536 in unavoidable Junk Fees that were not included in the originally advertised price of the unit, and not included in the cost breakdown So was presented at the time of viewing.

23.    Having already invested considerable time and energy in selecting an apartment, including an in-person walk through, and with the pressure of needing to move, So was left no reasonable alternative other than to sign the Greystar lease with unlawful Junk Fees and other charges added on top of the originally agreed-upon price.

24.    In total, ***Plaintiff So paid $751 in unavoidable, mandatory Junk Fees to Greystar that were not included in the advertised rental price.***

25.    Plaintiff Kaidi Wu's experience is substantially similar, with ***Junk Fees paid to Greystar totaling $2,984.31 that were not included in the advertised rental price.***

26.    Like Plaintiffs, tens of thousands of Californians have been impacted by Greystar's unlawful Junk Fee practices, which add up to tens of millions of dollars each year in illegal charges borne by consumers in the most critical of transactions.

27.    As President Biden explained before leaving office, "junk fees may not matter to the very wealthy, but they matter to most other folks in homes like the one I grew up in, like many of you did. They add up to hundreds of dollars a month. They make it harder for you to pay your bills."[1]

28.    In fact, a 2024 estimate from the White House found that Junk Fees cost Americans over $90 billion each year.[2]

---

[1] The White House, *President Biden's State of the Union Address*, The White House, https://web.archive.org/web/20250106155151/https://www.whitehouse.gov/state-of-the-union-2023/ (last visited April 29, 2025).

[2] The White House, *Readout of White House State Legislators Convening of Junk*

-5-

29.    The White House is not alone. The Federal Trade Commission ("FTC") has also issued a Junk Fee ban on short-term rentals and ticketed events.[3]

30.    Further, on January 16, 2025, the FTC and the State of Colorado brought an enforcement action against Greystar for "deceptively advertising low monthly rents only to later saddle tenants with hundreds of dollars of hidden junk fees."[4]

31.    While Plaintiffs welcome the FTC's action against Greystar, the FTC action does not seek to enforce California law against Greystar, the FTC does not seek to refund California consumers for the unlawfully charged Junk Fees, and in the current political climate, it is unclear whether the FTC's action will proceed.

32.    This action seeks to enforce California law and force Greystar to return unlawfully charged fees to Californians.

33.    As the Office of the California Attorney General succinctly explained after the Honest Pricing Act was passed, "***Put simply, the price a Californian sees should be the price they pay.***"[5] (Emphasis in original).

## II.    JURISDICTION AND VENUE

34.    The District Court of the Southern District of California has personal jurisdiction over the parties in this matter because Plaintiff Kaidi Wu is a resident of

---

*Fees*, The White House (April 24, 2024), https://web.archive.org/web/20250116070341/https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/24/readout-of-white-house-state-legislators-convening-on-junk-fees/ (last visited April 29, 2025).

[3] Fed. Trade Comm'n, *Federal Trade Commission Announces Bipartisan Rule Banning Junk Ticket and Hotel Fees*, Fed. Trade Comm'n (Dec. 17, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/12/federal-trade-commission-announces-bipartisan-rule-banning-junk-ticket-hotel-fees.

[4] Fed. Trade Comm'n, *FTC, State of Colorado Take Action Against Greystar, Nation's Largest Multi-Family Rental Property Manager, For Deceiving Consumers About Rent Prices*, Fed. Trade Comm'n (Jan. 16, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-state-colorado-take-action-against-greystar-nations-largest-multi-family-rental-property-manager.

[5] Cal. Dep't of Just. Off. of Att'y Gen., *SB 478 Frequently Asked Questions*, Cal. Dep't of Just. Off. of Att'y Gen., https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf (last visited April 29, 2025).

the State of California, many of the transactions at issue occurred in San Diego County, including the transactions of Plaintiff Wu, Greystar regularly conducts business within this District, and Plaintiff Juhyun So is a resident of California and consents to this Court's jurisdiction for purposes of this action.

35.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there exists minimal diversity between class members and Defendants and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

36.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c) because Plaintiff Kaidi Wu resides in San Diego County and Greystar's unlawful actions, which are the subject of this action, occurred in San Diego County, among other locations within California.

37.    Pursuant to California Cvil Code Section 1780(d), a declaration from Kaidi Wu, is attached as **Exhibit A**, confirming that venue is proper.[6]

### III.    PARTIES

38.    Plaintiff Kaidi Wu resides in San Diego County and is a citizen of California.

39.    Plaintiff Juhyun So resides in Los Angeles County and is a citizen of California.

40.    Defendant Greystar California, Inc. is a Delaware corporation with its headquarters in Charleston, South Carolina.

41.    Defendant Greystar Real Estate Partners, LLC is a Delaware corporation with its headquarters in Charleston, South Carolina.

---

[6] Plaintiffs note that it is unlikely that this state law procedural requirement is a valid requirement in a federal action but have included a venue declaration in an abundance of caution. *See Berk v. Choy,* Supreme Court Case No. 24-440 (granting cert to resolve circuit split regarding whether state statute requiring declaration supporting a complaint is enforceable in a federal proceeding).

42.    On information and belief, Does 1-20 are individuals and/or entities who facilitate Greystar's unlawful Junk Fee practices described in this Complaint. The identities of Does 1-20 are not presently known to Plaintiffs.

43.    Plaintiffs expressly reserve their right to amend this complaint to add the Doe Defendants by name, once their identities are known.

## IV.    FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A.    Companies like Greystar Use Junk Fees to Trick Customers into Paying More than They Otherwise Would for Goods and Services.

44.    Large, sophisticated companies—like Greystar—with large, sophisticated marketing departments know that Junk Fees ensure consumers pay more for a good or service than they otherwise would and should pay.

45.    Indeed, the White House estimates that Junk Fees cost consumers over $90 billion each year in the United States.[7]

46.    One of the most common junk fee pricing techniques is called "drip pricing," where a company does not disclose the total price of a product or service until late in the purchase process or incrementally discloses to fees to the consumer throughout the transaction, after consumers have already expended time and effort and committed to the originally disclosed price.

47.    Once a consumer decides what to buy, he is unlikely to depart from that decision because of the "additional cognitive effort" involved in resuming his search.[8]

---

[7] The White House, *Readout of White House State Legislators Convening on Junk Fees*, The White House (April 24, 2024), https://web.archive.org/web/20250116070341/https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/24/readout-of-white-house-state-legislators-convening-on-junk-fees/ (last visited April 29, 2025).

[8] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16-17, https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

CLASS ACTION COMPLAINT

48.    In other words, omitting junk fees from the advertised price induces consumers to pay a higher total price than they otherwise would have.

49.    Indeed, as the companies that engage in junk fee practices are well aware, consumers choose a product or service based on the advertised disclosed "base price," and not based on the dripped price, especially when junk fees are not adequately disclosed.[9]

50.    Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip sizes . . . consumers more frequently fail to identify the cheapest offer."[10]

51.    In fact, studies show that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[11]

52.    As the FTC's Bureau of Economics has explained, the use of junk fees and drip pricing adds steps to the process of determining the actual price of a good or service, which forces consumers to pay more than they would if presented with fully disclosed prices, including all applicable fees.[12]

---

[9] Alexander Rasch *et al. Drip pricing and its regulation: Experimental evidence*, 176 J. Econ. Behavior & Org. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("buyers . . . . based their purchase decision exclusively on the base price") (last visited April 15, 2025).

[10] *Id.*

[11] Shelle Santa, Steven K. Dallas, and Vicki G. Morwitz, *Consumer Reactions to Drip Pricing*, Marketing Science (Jan. 15, 2020), at 189, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3924320.

[12] Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, *supra* note 8, at 2-3.

53.     As a result, consumers are forced either to "incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [purchase], or both."[13]

54.     The FTC has thus characterized junk fees as especially egregious when they are hidden (i.e., "disclosed only at a later stage in the consumer's purchasing process or not at all"), because openly disclosed Junk Fees would enable consumers to determine whether or not the cost favorable compared to those prices listed by competitors.[14]

55.     Moreover, drip pricing runs afoul of the FTC Act itself. *See* 15 U.S.C. § 45(a)(1) (declaring unlawful "unfair or deceptive acts or practices in or affecting commerce"). And the FTC's guidance on bait and switch advertising states that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a). If the first contact is secured by the deceptive bait advertisement, it is a violation of law even if the true facts are subsequently made known to the buyer. 16 C.F.R. § 238.2(b). Through drip and/or partitioned pricing, companies induce consumers to choose a

---

[13] *Id.* at 4; *see also* David Friedman, *Regulating Drip Pricing*, 31 Stanford Law & Policy Review 51 (February 18, 2019), at 67, https://ssrn.com/abstract=3337073 (". . . sellers provide buyers with the 'initial value' in the form of the initially-presented base price. . . . Buyers are influenced by the initial value, so a lower base price would create the impression of a lower overall price." (citing Gorkan Ahmetoglu et al., *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. Retailing & Cons. Services 696, 697 (2014))).

[14] *See, e.g.*, Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified 16 C.F.R. Part 464) ("After a market leader took unilateral action to phase out hidden fees, the platform 'lost significant market share and abandoned the policy after a year because consumers perceived the platform's advertised prices to be higher than its competitors' displayed prices.'" (citation omitted)).

-10-

product or service based on an advertised price (i.e., the "bait"), despite ultimately charging a different and higher price than advertised (the "switch").

56.    Given this, it is no surprise that companies are motivated to hide junk fees through drip pricing for as long as possible in the search and purchase process, as duping consumers into paying junk fees brings in substantial revenue.

57.    In many instances, companies even compound the benefit they obtain through these practices by increasing junk fees at a higher rate than they increase the base price of the underlying product or service itself.[15] As a result, the product or service appears cheaper to consumers than competitor products or services, even though the total cost of the product or service, inclusive of junk fees, is equally if not more expensive than those other companies' products or services.[16]

58.    Companies are also able to increase hidden junk fees without suffering meaningful market consequences.[17] In particular, companies are free to charge excessive junk fees in part because drip pricing impedes fair, honest, and free market competition.[18]

59.    Hence, through drip pricing, companies can charge excessive junk fees while skirting economic consequences, as shrouding the fee avoids deterring consumers from purchasing a given product or service based on a junk fee and its effect on the total price.

60.    Meanwhile, competitor companies and consumers face the consequences. Companies that engage in drip pricing will lure consumers away from honest competitors that do not engage in such practices (and thus appear to charge

---

[15] *Id.*

[16] See *id.*

[17] Rasch *et al. Drip pricing and its regulation: Experimental evidence*, *supra* note 9.

[18] *Id.* ("firms fiercely compete in base prices but not in drip prices," so "total price increases when firms use drip pricing").

CLASS ACTION COMPLAINT

higher prices) and the dishonest companies will earn a larger share and make higher profits than those competitors.[19]

61.     Junk fees charged through drip and/or partitioned pricing also generate significant burden for individual consumers.[20]

62.     Put simply, junk fees and drip pricing are bad for consumers, are bad for businesses, and are bad for competition.

**B.     California's Housing Crisis.**

63.     California is in a decades long housing crisis.

64.     California has the second lowest rate of homeownership in the country and the highest rate of homelessness in the nation. About half the state's population is forced to rent, largely because they cannot afford to own a home.[21]

65.     Corporate landlords make these circumstances worse by driving down supply, driving up costs, and generally putting profits over people.

66.     Among other tools used by corporate landlords to drive up costs are sophisticated pricing algorithms that allow corporate landlords to outperform the market.

67.     For example, a recent ProPublica article noted the "nation's largest property management firm, Greystar, found that even in one downturn, its buildings using YieldStar [a pricing algorithm] 'outperformed their markets by 4.8%,' a

---

[19] *Id.* (". . . where there is uncertainty about the drip size, sellers with a high drip-price limit can earn profits above the competitive level.").

[20] *See* Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified 16 C.F.R. Part 464) (explaining that "[c]onsumers faced with such fees pay upward of twenty percent more than when the actual price was disclosed upfront," and, as a result, such fees "impose substantial economic harms on consumers").

[21] Cristopher and Manuela Tobias, *Californians: Here's why your housing costs are so high*, CalMatters (Oct. 15, 2024), https://calmatters.org/explainers/california-housing-costs-explainer/.

CLASS ACTION COMPLAINT

significant premium above competitors, RealPage said in materials on its website. Greystar uses RealPage's software to price tens of thousands of apartments."[22]

68.    Junk fees are often part of these sophisticated marketing and pricing tactics.

**C.    Greystar's Responsibility to Provide Habitable Dwellings.**

69.    California law requires landlords to provide livable residences to their tenants.

70.    Specifically, California Civil Code § 1941.1(a) provides, in pertinent part that:

> A dwelling shall be deemed untenantable for purposes of Section 1941 if it substantially lacks any of the following affirmative standard characteristics … (6) Building, grounds, and appurtenances at the time of the commencement of the lease or rental agreement, and all areas under control of the landlord, kept in every part clean, sanitary, and free from all accumulations of debris, filth, rubbish, garbage, rodents, and vermin. (7) An adequate number of appropriate receptacles for garbage and rubbish, in clean condition and good repair at the time of the commencement of the lease or rental agreement, with the landlord providing appropriate serviceable receptacles thereafter and being responsible for the clean condition and good repair of the receptacles under his or her control ….

71.    Said plainly, it is the landlord's responsibility to pay for adequate pest control and trash services for the entire apartment building complex.

72.    Therefore, landlords in California cannot lawfully charge tenants for these services as a separate fee that is not included in the disclosed cost of rent, and any provision in a Greystar lease that does this is thus improper and unconscionable, in violation of California law, and cannot be enforced.

73.    Greystar divided the costs of the pest control and trash equally among all the units in the complex. These costs were not a result of any particular action or

---

[22] Heather Vogell and Haru Coryne, *Rent Going Up? One Company's Algorithm Could Be Why*, ProPublica (Oct. 15, 2022), https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent.

CLASS ACTION COMPLAINT

1  inaction by Plaintiffs or the Class but instead were routinely assessed every month
2  and allocated equally among all the units.

3      74.    Tenants such as Plaintiffs and other members of the Class depend on
4  landlords and their affiliates, such as Greystar, to be truthful about what fees can be
5  properly charged in a lease in California and do not expect that they will be charged
6  improper fees that are not allowed under California law, such as separate fees for pest
7  control and trash not included in the disclosed cost of rent.

8      75.    Many residential property companies and their affiliates do not charge
9  their tenants in California separate fees for pest control or trash services knowing
10 that, under California law, such costs must be absorbed by the landlord and included
11 in the rent. These extra fees cause consumers, such as Plaintiffs and the Class, to be
12 unable to meaningfully compare expenses between apartments when deciding where
13 to live, which also hurts them and the competition in the California rental market.

14     76.    Greystar, by shifting to tenants the costs of pest control and trash,
15 avoids covering the costs for these services, thereby increasing its profits every
16 month from every rental unit. But this is not permitted under California law.

17     77.    Greystar's practice of charging improper and illegal pest control and
18 trash fees takes unfair advantage of tenants' reasonable expectations that basic
19 necessities are to be included in their monthly rent. Under California law, the pest
20 control and trash services for which Greystar charges and collects payment are
21 essential for maintaining tenantable living conditions, which Greystar is legally
22 responsible for providing to tenants. Shifting Greystar's responsibilities onto tenants
23 like Plaintiffs and the Class and charging them extra for these essential services is
24 deceptive and unfair and violates California law. *See* Cal. Civ. Code §§ 1941.1(a)(6)
25 and (7); *see also Green v. Superior Court of San Francisco*, 517 P.2d 1168, 1182
26 (Cal. 1974) (under the implied warranty of habitability, "a residential landlord
27 covenants that premises he leases for living quarters will be maintained in a habitable
28 state for the duration of the lease").

78.    A sample residential lease by the California Association of Realtors ("CAR") demonstrates that only with respect to a single-family house does California law sometimes permit landlords to agree with tenants that the tenant will pay for pest control.[23] In Paragraph 11.G. of that document, entitled "PERIODIC PEST CONTROL," it states as follows:

> **G. PERIODIC PEST CONTROL:** ☐ Housing Provider ☐ Tenant shall pay for periodic pest control by the following service provider:
> _____. This obligation shall only be applicable if the Premises is a house and the periodic pest control treatment is being provided at the execution of this Agreement. The current cost of such treatment is: $ _____ per _____ .

79.    As shown above, the landlord and tenant can agree that the tenant will pay for periodic pest control "only … if the Premises is a house and the periodic pest control is being provided at the execution of this Agreement." Moreover, it specifically lays out "[t]he current cost of such treatment" so the single-family house tenant knows what he/she is agreeing to pay. This CAR sample residential lease demonstrates how California Civil Code § 1941.1(a) applies—that in multiple-family rental properties such as those at issue here—it is the legal and financial responsibility of the landlord to pay for pest control.

/ / /

/ / /

/ / /

---

[23] *See, e.g.,* https://sparta505.com/forms_docs/Lease%20agreement%20sample.pdf (updated 12/23) (last visited April 10, 2025).

CLASS ACTION COMPLAINT

80.    A California Consumer Alert issued by the California Department of Justice, Office of the Attorney General ("Consumer Alert"),[24] makes clear that it is the responsibility of the landlord to provide pest control and trash services:



**KNOW YOUR RIGHTS AS A CALIFORNIA TENANT**
**YOUR RIGHT TO A SAFE AND WELL-MAINTAINED HOME**

- **Your landlord must keep your home "habitable"—meaning, safe and fit to live in.** (See, for example, Civil Code, § 1941.1.) This is true regardless of the home's condition when you moved in. For example, your landlord must provide:
  - Working plumbing, including hot and cold water and sewage disposal.
  - Safe and working electrical equipment and wiring, including lighting.
  - Heating.
  - Walls and roofs that keep out rain and wind.
  - Unbroken windows and doors, with working locks.
  - Working smoke detectors and carbon monoxide detectors.
  - Safe fire or emergency exits.
  - Adequate pest control for rodents (like rats) and insects (like roaches and bed bugs).
  - Adequate sanitation, including enough trash cans, and clean common areas.
  - Floors, stairways, and railings in good repair.
  - Repairs to prevent and fix health hazards, such as fire hazards, visible mold, or dampness.

81.    If the landlord can simply shift the cost of pest control and trash onto the tenants, then § 1941.1 would have no meaning.

**D.    Greystar's Predatory Business Model.**

**1.    Greystar Is the Largest Residential Property Manager in the United States, Generally Managing High-End Properties that Include a Multitude of Amenities and Services.**

82.    Greystar is the largest residential property management company in the United States, managing over 700,000 rental units, directly owning more than 100,000 additional rental units, and has over $75 billion in managed assets. To support these massive operations, Greystar has over 20,000 employees, including sophisticated marketing and pricing teams.

---

[24] *See* Cal. Dep't of Just. Off. of Att'y Gen., *Know Your Rights as a California Tenant Your Right to a Safe and Well-Maintained Home*, Cal. Dep't of Just. Off. of Att'y Gen., https://oag.ca.gov/system/files/media/Know-Your-Rights-Habitability-English.pdf (last visited Apr. 29, 2025).

83.    Greystar purports to provide "end-to-end property management services for residential housing, apartment homes, furnished corporate housing, and mixed-use properties incorporating retail space."[25] These services include advertising units, reviewing applications, signing tenants, and then charging and collecting Junk Fees from the tenants in excess of the originally advertised prices.

84.    The properties owned and managed by Greystar are generally high-end and include features and services that go beyond standard housing or real-estate contracts. For example, many properties include gyms, recreational centers, pool tables, ping pong tables, swimming pools, cleaning services, furnishings, security services, tech services, package holding services, dry cleaning services, and concierges, among other services.

85.    These additional services and amenities make clear that a contract with Greystar is for more than just real estate.

86.    For example, Plaintiff Wu's property includes a luxury pool, game room, gym, and other services and amenities. Similarly, Plaintiff So's property includes two pools, clubhouses, a Wi-Fi lounge, coffee bar, bocce court, recording studio, fitness center, and a screening room, among other services and amenities.

87.    A Greystar apartment is often more analogous to a hotel stay than a traditional apartment rental.

### 2.    Greystar's Deceptive Advertising Practices.

88.    Greystar deceptively advertises monthly leasing costs that are lower than the actual price tenants must pay to lease Greystar rental units. The actual price is higher than the advertised price because Greystar adds on numerous mandatory Junk Fees. In addition to advertising deceptively low prices, Greystar fails to adequately inform prospective tenants about these Junk Fees.

---

[25] *See* Greystar, *Apartment Property Management Solutions*, Greystar, https://www.greystar.com/business-services/property-management (last visited April 29, 2025).

CLASS ACTION COMPLAINT

89.    Added together, these Junk Fees can significantly increase the cost of renting a unit at a Greystar property by tens to hundreds of dollars each month, often adding up to over $500 each year in extra costs to tenants.

90.    Greystar often internally refers to the rent price, exclusive of Junk Fees, as "base rent."

91.    The Junk Fees vary depending on the specific Greystar-managed property, but typical examples include:

   a.    trash fees (often $25-50 per month, in addition to any separate charge for residential trash collection);

   b.    monthly administrative fees for the dissemination of utility or trash bills on top of the tenant's portion of the utility charges (often between $4-5 per month);

   c.    one time utility account set up fees of ($10-20);

   d.    pest control fees (typically between $1-4 per month).

92.    Greystar's Hidden Fees can take other forms as well. For example:

   a.    At some Greystar-managed properties, Greystar bundles several Hidden Fees together and refers to them collectively as an "Amenity Fee," "Community Fee," "Lobby Fee," or "Lifestyle Fee."

   b.    In some cases, Greystar charges tenants monthly for "Miscellaneous Fees" or "Miscellaneous Income." These fees may cover one or more of the above-described services, but they are assessed without further explanation on the tenant's monthly account statement.

93.    In some instances, the Junk Fees are associated with services that are advertised as amenities without any mention of an additional cost for the service (for example, some of the technology packages) or with services that relate to the basic

-18-

CLASS ACTION COMPLAINT

maintenance and logistics associated with property management (for example, utility billing or pest control).

94.     Greystar tenants must pay for the services described above, even if the tenants neither want nor use the services.

95.     Greystar advises property owners about which mandatory ancillary services to include at their properties. Greystar also assists property owners in deciding the amount to charge tenants for those services.

96.     Current and former Greystar executives have publicly touted Greystar's ability to obtain ancillary income for property owners through the mandatory imposition of these services and their associated fees. Several third-party service vendors contracted by Greystar also promote their services, such as valet trash or package delivery, as a means of acquiring extra income from tenants on top of rent.

97.     Property owners are not the only ones benefitting from the mandatory imposition of ancillary fees. Because Greystar generally receives a percentage of all nonrefundable amounts paid by tenants, the more fees Greystar-managed properties charge, the more money Greystar makes as well. For at least one preferred ancillary service vendor, Greystar also receives a percentage of all amounts paid by properties to the service vendor, which is based on the total number of units at Greystar-managed properties that mandate the service for tenants.

98.     Indeed, between August 2019 and August 2022, on behalf of the property owners, Greystar collected more than $100 million in Junk Fees from tenants at Greystar-managed properties in California, Colorado, Nevada, and Utah alone.

99.     Greystar does not provide a total monthly leasing price, inclusive of all mandatory fees, in its external advertisements or on its property websites. For some Greystar-managed properties from at least August 2019 until late 2024, Greystar provided fee information only after prospective tenants had completed the entire application process and paid an application fee.

-19-

100.   For nearly every other Greystar-managed property, Greystar withheld fee information until after prospective tenants identified a floor plan and selected a lease duration. Even then, however, Greystar often still failed to include the full range of Junk Fees and thus continued to misrepresent the total monthly cost of renting a unit.

### 3.     Greystar's Uniform Rental Agreements.

101.   On information and belief, all of Greystar's California properties are subject to substantially the same Form Lease terms and policies.

102.   The Form Lease is a contract of adhesion consisting of boilerplate terms and provided to tenants on a take-it-or-leave-it basis.

103.   As a result of the standardized language, all Greystar tenants are subject to essentially identical lease terms regardless of where they reside in California.

104.   A sample lease is attached hereto as **Exhibit B.**

105.   Among other terms, Greystar lists the total monthly rent (which omits the Junk Fees), and it is not until much later in the Form Lease that the user will find the "Utility and Services Addendum" where Junk Fees are identified for the first time.

### 4.     Greystar's Uniform Junk Fee Practices.

106.   Greystar charges its tenants a variety of mandatory Junk Fees that were not disclosed in the originally advertised and/or contracted for price.

107.   Those Junk Fees include, without limitation, the Utility Service Fee, Administrative Fees, the Trash Fee, and the Pest Control Fee, which all violate California law prohibiting "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges." Cal. Civ. Code § 1770(a)(29)(A).

108.   Greystar systematically imposes a Utility Admin Fee of between $4.00-$6.00 per month that is not disclosed in the originally displayed price to consumers.

109.   There is no way for a tenant to rent a Greystar apartment without paying the Utility Admin Fee.

110.   Greystar systemically imposes a Trash Fee in amounts ranging from $25-$50 per month that is not disclosed in the originally displayed price to consumers.

111.   There is no way for a tenant to rent a Greystar apartment without paying the Trash Fee.

112.   Greystar systemically charges all California tenants a Pest Control Fee in amounts ranging from $1-$4 per month that is not disclosed in the originally displayed price to consumers.

113.   There is no way for a tenant to rent a Greystar apartment without paying the Pest Control Fee.

114.   When a tenant refuses to pay the Junk Fees Greystar deducts the Fee from the tenants following rent payment, meaning that the tenant will be behind on rent and subject to eviction.

115.   Greystar's pricing structure and disclosure practices are deceptive because they do not include the Junk Fees as part of advertised rents and only disclose the fees after tenants have made initial payments and time commitments to Greystar.

116.   Greystar misrepresents the total costs of its rental units by omitting the Utility Admin Fees, Trash Fees, and Pest Control Fees from advertised rent prices.

117.   Tenants are not informed of the Utility Admin Fees, Trash Fees, and Pest Control Fees until they are presented with the Form Lease, which is well after they have already expended substantial effort into searching for a rental, initiating the rental process, paying non-refundable application fees, administrative fees, security deposits, pet deposits and their first month's rent. Thus, at the point the Utility Admin Fee, Trash Fees, and Pest Control Fees are disclosed, it is near-impossible and incredibly cost prohibitive to find alternative housing to avoid the Junk Fees.

118.   Through the imposition of Junk Fees, Greystar misrepresents the characteristics and identity of the product and services received for the payment of monthly rents.

119.   By advertising rental housing in exchange for a monthly rent amount, Greystar represents that tenants will receive a suitable dwelling place in exchange for the payment of monthly rent. However, tenants later learn that they will not receive a suitable dwelling place without additional purchases in the form of additional mandatory fees.

120.   Greystar continues to misrepresent the characteristics and identity of the product and services received in exchange for the payment of monthly rents.

121.   Worse yet, tenants do not receive any additional utility services by paying the Utility Admin Fee. Tenants' ledgers show that they are already paying a fee for the utilities of gas, trash, and sewer, and electricity is paid for by the tenant directly to the relevant electricity provider.

122.   The Utility Admin Fee is nothing but a pure profit generator without any actual purpose.

123.   Greystar's deceptive advertising, pricing structure, and inflation of its fees all harm California consumers. Consumers are unable to truly compare the cost of different apartments and are financially harmed when they must pay fees they did not expect (and may be unable to afford). And consumers are also harmed by Greystar's mandatory inflated fees, which tenants have no opportunity to negotiate, and which may balloon in Greystar's sole discretion.

124.   Greystar charged Plaintiff Wu $4.75 per month, or $57 a year, on top of advertised leasing rates, for the simple privilege of providing the Wu with the ability to pay rent. Greystar charged Plaintiff So $5 per month, or $60 per year, on top of advertised leasing rates, for the simple privilege of being able to also pay a trash fee. On information and belief, Greystar charges approximately $50-$60 per year in

utility administration fees to all California tenants, thereby generating tens of millions of dollars in unlawful fees.

125. Greystar charged Plaintiff Wu and Plaintiff So amounts ranging from $35 to $50 per month, or $420 to $600 a year, on top of advertised leasing rates, to live in an apartment where they can dispose of trash. On information and belief, Greystar charges approximately $420 to $600 per year to all California tenants, thereby generating tens of millions of dollars in unlawful fees.

126. Greystar charged Plaintiff Wu and Plaintiff So amounts ranging from $1.12 to $3 per month, or $13.44 to $36 a year, on top of advertised leasing rates, to live in an apartment that is pest free. On information and belief, Greystar charges approximately $13.44 to $36 per year to all California tenants, thereby generating millions of dollars in unlawful fees.

127. Greystar's Utility Admin Fee, Trash Fee, and Pest Control Fee are precisely the type of "Junk Fees" that have come under government scrutiny in recent years:

> Junk fees are fees that are mandatory but not transparently disclosed to consumers. Consumers are lured in with the promise of a low price, but when they get to the register, they discover that price was never really available. Junk fees harm consumers and actively undermine competition by making it impractical for consumers to compare prices, a linchpin of our economic system.[26]

128. As the Federal Trade Commission said recently in its effort to combat junk fees:

> [M]any consumers said that sellers often do not advertise the total amount they will have to pay, and disclose fees only after they are well into completing the transaction. They also said that sellers often misrepresent or do not

---

[26] The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, The White House (March 5, 2024), available at https://bidenwhitehouse.archives.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/ (last visited April 29, 2025).

CLASS ACTION COMPLAINT

adequately disclose the nature or purpose of certain fees, leaving consumers wondering what they are paying for or if they are getting anything at all for the fee charged.[27]

129.  In its 2013 publication "Disclosures: How to Make Effective Disclosures in Digital Advertising, the FTC makes clear that when advertising and selling are combined on a website, and the consumer will be completing the transaction online, the disclosures should be provided before the consumer makes the decision to buy – for example, before the consumer "add[s] to shopping cart."[28]

130.  Greystar violates federal guidance by adding Junk Fees so late in the rental process well after the consumer "add[s] to shopping cart", and by failing to disclose the nature of the Junk Fees and whether consumers are getting a benefit at all from the fee charged. Worse yet, there is no actual additional administration of utilities performed where the tenants are already paying for utilities.

131.  The Junk Fees provides no additional value to consumers not already paid for by the tenant. There is no additional "administration" provided by Greystar. The Junk Fees are merely a second payment for the services for which the tenants are already paying Greystar.

132.  Greystar imposes undisclosed, deceptive, and unfair junk fees on families who are coerced into believing that they have no choice but to pay them. By this conduct, Greystar has engineered a "pay junk fees to play" scheme. Having invested substantial time, money, and resources into preparing for a move, tenants are left with no choice but to pay the Junk Fees unilaterally set by Greystar with zero relationship to the service actually being provided.

---

[27] Fed. Trade Comm'n, *FTC Proposes Rule to Ban Junk Fees – Proposed rule would prohibit hidden and falsely advertised fees*, Fed. Trade Comm'n (October 11, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees.

[28] *See* Fed. Trade Comm'n, *.com Disclosures: How to Make Effective Disclosures in Digital Advertising* at ii, 14 (Mar. 2013), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf.

CLASS ACTION COMPLAINT

E.    **California's Junk Fee Ban.**

133.    Given the widespread use of junk fees, drip pricing, and bait and switch tactics, in 2023, California took decisive action to protect its citizens.

134.    On October 7, 2023, California enacted the Honest Pricing Act (effective July 1, 2024), which expressly banned junk fees in California by prohibiting businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges." Cal. Civ. Code § 1770(a)(29)(A).

135.    The Honest Pricing Act further confirmed that drip pricing and bait and switch advertising were already illegal in California, providing that the "act is intended to specifically prohibit drip pricing, which . . . like other forms of bait and switch advertising, is prohibited by existing statutes, including the Unfair Competition Law . . .  and the False Advertising Law." Cal. SB 478 at § 1(a)-(b) (emphasis added).

136.    The key provisions of the Honest Pricing Act were added to California's Consumer Legal Remedies Act Cal. Civ. Code §§ 1750, *et seq.,* ("CLRA") at Section 1770(a)(29)(A), which provides robust enforcement tools for consumers, including:

a.    Prohibiting the waiver of any substantive rights provided for under the CLRA. *Id.* § 1750

b.    Requiring that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Id.* § 1760.

c.    Establishing a substantive right to litigate in the forum where the transaction occurred. *Id.* § 1780(d).

d.    Establishing a substantive right to pursue class claims. *Id.* § 1781; *see also id.* § 1752.

e.    Authorizing injunctive relief. *Id.* § 1780(a)(2)

f.    Authorizing actual damages. *Id.* § 1780(a)(1).

g.    Authorizing restitution of unlawfully taken sums. *Id.* § 1780(a)(3).

h.    Authorizing punitive damages. *Id.* § 1780(a)(4).

i.    Authorizing statutory damages of $1,000 per violation. *Id.* § 1780(a)(1).

j.    Authorizing statutory damages of $5,000 per injured individual, where the unlawful conduct was directed against the elderly or the disabled. *Id.* § 1780(b)(1).

k.    Requiring that the Court "shall award court costs and attorney's fees to a prevailing plaintiff in litigation." *Id.* § 1780(e).

137.    To help guide businesses into compliance with the law, on May 8, 2024, the California's Office of the Attorney General issued a robust set of "Frequently Asked Questions" about what the Honest Pricing Act requires of businesses.[29]

/ / /

/ / /

/ / /

---

[29] Cal. Dep't. of Just. Off. of the Attn'y Gen., *SB 478 Frequently Asked Questions*, Cal. Dep't. of Just. Off. of the Attn'y Gen.https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf (last visited April 29, 2024).

138.   Among other guidance, the Attorney General's FAQ, answers the following core questions:

Put simply, **_the price a Californian sees should be the price they pay._**

In order to help businesses comply with this new law, and to offer consumers guidance about what they can expect, the Attorney General's Office is releasing a set of FAQs. The law is found at Section 1770(a)(29) of the California Civil Code.

### What is the purpose of this law?

The law is "intended to specifically prohibit drip pricing, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service." Advertising or listing a price that is less than what a consumer will eventually be charged is a form of deceptive advertising that also violates existing state and federal law. Truthful price advertising and listing helps businesses compete fairly on price and allows consumers to make accurate price comparisons.

### What does the new law require?

The law requires honest pricing. It prohibits businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges" other than government-imposed taxes or fees or reasonable shipping costs. The text of the law can be found at section 1770(a) (29) of the California Civil Code.

### What can a business exclude from the advertised price under this law?

The listed or advertised price does not need to include taxes and/or fees that the government imposes on the transaction, such as sales tax. In addition, the listed or advertised price does not need to include reasonable shipping costs for physical goods.

### Can a business comply with this law by disclosing additional required fees before a consumer finalizes a transaction?

No. The price listed to the consumer must be the full price that the consumer is required to pay.

### Can a business comply with this law by advertising a price that is less than what a consumer will actually have to pay, but disclosing that additional fees will be added?

No. The price advertised to the consumer must be the full price that the consumer is required to pay.

### Can a business comply with this law by listing or advertising one price and separately stating that an additional percentage fee will apply?

No. The price listed or advertised to the consumer must be the full price that the consumer is required to pay.

### Can a business comply with this law by advertising the total price for a good or service and separately noting that the total price includes certain fees and charges?

Yes. The price advertised to the consumer must be the full price that the consumer is required to pay. But the law does not limit a merchant's ability to include fees or charges in that total price, or to tell consumers that its prices include those fees or charges.

### Does this law prohibit a business from advertising one price and adding a variable service fee later in the transaction?

Yes. The price listed or advertised to the consumer must be the full price that the consumer is required to pay.

CLASS ACTION COMPLAINT

**F.    Greystar's Decision to Ignore the California Junk Fee Ban.**

139.    Greystar is aware that pricing is the top consideration for most prospective tenants when choosing a rental unit. Greystar also knows, through many complaints from tenants and prospective tenants and lawsuits, that it is misrepresenting the price of rental units and deceiving consumers about the true cost of renting a unit with Greystar.

140.    Despite widespread media attention regarding the Honest Pricing Act, Greystar did not update its practices by July 1, 2024.

141.    Despite having had over eight months to bring its practices into compliance since the passage of the ban in October 2023, Greystar did not update its practices by July 1, 2024.

142.    Despite the California's Office of the Attorney General issuing public guidance on compliance in May 2024, Greystar did not update its practices by July 1, 2024.

143.    Despite many other companies bringing their practices into compliance at the last minute, Greystar did not update its practices by July 1, 2024.

144.    Put simply, Greystar made a conscious decision to ignore California's Junk Fee ban.

**G.    The FTC's Enforcement Action Against Greystar.**

145.    On January 16, 2025, the FTC and the State of Colorado brought an enforcement action against Greystar for "deceptively advertising low monthly rents only to later saddle tenants with hundreds of dollars of hidden junk fees."[30]

146.    A true and correct copy of the FTC's Complaint against Greystar is attached as **Exhibit C**, and those allegations are expressly included by reference into this Complaint as if fully stated herein.

---

[30] *See supra*, Fn. 4.

-28-

147.   While Plaintiffs welcome the FTC's action against Greystar, notably, the FTC action does not seek to enforce California law against Greystar, the FTC's Complaint does not seek a refund for California consumers of the unlawfully charged Junk Fees, and in the current political climate, it is unclear whether the FTC action will move forward.

**H.    Plaintiffs' Experience with Greystar's Unlawful Junk Fees.**

**1.    Plaintiff Kaidi Wu's Experience.**

148.   Plaintiff Wu is originally from Michigan, but moved to San Diego, California right at the start of the COVID-19 pandemic to start her doctoral program at San Diego State University.

149.   In August 2020, Plaintiff Wu moved into an apartment in San Diego, but due to habitability concerns, was forced to leave it. While searching for new housing, and under intense pressure to find permanent housing, Plaintiff Wu found an apartment on the Greystar website, located at 8800 Lombard Place, San Diego, CA 92122, called Palisade UTC.

150.   Palisade UTC was developed and built by an Australian based company, Westfield, in partnership with Greystar. Palisade UTC was owned by UTC Residential Owner LLC, but has been managed and leased by Greystar since it was finished in 2019.

151.   When Plaintiff Wu found UTC Palisade online, the apartment was listed for $2,625 per month on the Greystar website. The listing made no mention of mandatory Junk Fees.

152.   On or about August 15, 2020, Plaintiff Wu called to see a unit and was told to apply and pay an application fee. As a part of the application process, Plaintiff Wu had to provide employment information and information on her past tenancy. Plaintiff Wu also paid the $50.94 application fee.

153.   On or about August 15, 2020, Plaintiff Wu visited UTC Palisade and toured an apartment. After touring the apartment, Plaintiff Wu was presented with a

lease agreement where Greystar, for the first time, disclosed that Plaintiff Wu was required to pay Junk Fees including a Utility Administration Fee, Trash Fee, and Pest Control Fee.

154.    Plaintiff Wu asked whether these Junk Fees could be avoided and what they were for. Plaintiff Wu was told that the Junk Fees were non-negotiable and mandatory.

155.    Because Plaintiff Wu had invested time and money into visiting UTC Palisade, and because of the mounting pressure to find permanent housing, Plaintiff Wu signed the 2020 Lease.

156.    From August 2020 through August 2022, Plaintiff Wu was charged monthly junk fees totaling $40.87, including a "pest control" fee of $1.12, a "monthly administrative billing fee" of $4.75, and a "trash fee" of $35.

157.    Each of these fees were for services that are the responsibility of Greystar and should not have been passed on to Plaintiff Wu.

158.    Between August 2020 and August 2022, Plaintiff Wu paid at least $980.88 in Junk Fees.

159.    After August 2022, Plaintiff Wu went month-to-month with Greystar for 29 months. During the 29-month period, Greystar fluctuated the amount of Junk Fees, including increasing the "monthly administrative billing fee" to $4.95 and increasing the Trash Fee to $50 in November 2023.

160.    As a result of Greystar's Junk Fee scheme, ***Plaintiff Wu has paid at least $2,984.31 in Junk Fees that were not included in the advertised rental price.***

### 2.    Plaintiff Juhyun So's Experience.

161.    In November 2022 Plaintiff So viewed a Greystar apartment complex, the Vox, located at 3333 La Cienega Blvd, Los Angeles, CA, 90016 online. The amount listed for the rent was $3,434.

162.    The Vox was developed and built by Greystar in 2022 and is located in West Los Angeles. Plaintiff So would go on to be one of the first tenants in a, at that time, mostly vacant building.

163.    On November 28, 2022, Plaintiff So paid a $106.00 application fee to apply to be a tenant of Greystar at the Vox. As part of the application process, Plaintiff So had to provide employment information and information on past tenancy.

164.    Also on November 28, 2022, Plaintiff So was required to pay a $300 holding fee for Greystar to hold the apartment to tour it. Again, this apartment complex was mostly vacant and yet Greystar demanded a $300 holding fee to hold the vacant apartment for Plaintiff So.

165.    On December 4, 2022, Plaintiff So did a walk-through at the Vox and was provided with a breakdown of the monthly costs, which appeared as follows:

*The following is a breakdown of your monthly rental charges, deposits, and move-in fees:*

| MONTHLY CHARGES | | DEPOSITS | | FEES | |
|---|---|---|---|---|---|
| RENT | $3,434.00 | SECURITY DEP. | $750.00 | ADMIN | N/A |
| SCEP FEE | $2.83 | PET DEPOSIT | 0.00 | APPLICATION | $106.00 |
| PARKING | N/A | ADDITIONAL DEPOSIT | 0.00 | PET | N/A |
| PET RENT | N/A | OTHER | 0.00 | OTHER | N/A |
| OTHER | N/A | OTHER | 0.00 | OTHER | N/A |
| OTHER | N/A | OTHER | 0.00 | OTHER | N/A |
| OTHER | N/A | TOTAL | $750.00 | OTHER | N/A |
| OTHER | N/A | | | OTHER | N/A |
| TOTAL | $3,436.83 | | | TOTAL | $106.00 |

166.    Greystar again reaffirmed that the cost of the apartment Plaintiff So saw online, applied for, paid an application fee for, paid a $300 holding fee for, and viewed in person, was $3,434 per month, now pus a "SCEP fee" of $2.83. Under the section titled "Fees," Greystar listed nothing other than the $106.00 application fee.

167.    On December 11, 2022, Plaintiff So was provided with a formal lease agreement which included the following mandatory fees: $20 "New Trash account fee;" $5.00 "Trash Administrative fee," and an additional trash fee of $35 per month. In addition, Plaintiff So was presented with a $3 per month pest control fee.

168.    For a 1-year span, Plaintiff So would be required to pay $536 for unavoidable junk fees.

CLASS ACTION COMPLAINT

169.    With the pressure of needing to move and the fact that Plaintiff So had invested time and money into the transaction, Plaintiff So agreed to sign the lease on December 11, 2022. A copy of Plaintiff So's lease is attached as **Exhibit B**.

170.    During this 15-month lease term, Plaintiff So paid $751 in unavoidable, mandatory Junk Fees that were not included in the advertised rental price.

## V.    CLASS ALLEGATIONS

171.    This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), including, without limitation, Sections (b)(2) and (b)(3) of Rule 23.

172.    Plaintiffs seek certification of the following class (the "Class"):

> All persons who were charged a mandatory fee by Greystar that exceeded the advertised and/or contracted rental rate for a residential lease in California within the six years prior to the filing on this action.

> All persons who paid Greystar separate fees for pest control, trash/trash administrative, and/or utility administrative services not included in the rent for a residential lease in California within the six years prior to the filing on this action

173.    Greystar's deceptive Junk Fee practices violated each Class members' individual statutory right to truthful information from Greystar about the actual price of rent.

174.    Greystar's deceptive Junk Fee practices have resulted in actual injury and harm to the Class members in the amount of the Junk Fees which were absent from the advertised price and which they paid as a result of Greystar's Junk Fee practices.

175.    Plaintiffs explicitly reserve their right to amend, add to, modify, and/or otherwise change the proposed class definitions as discovery in this action progresses.

176.   The following people are excluded from any of the Class: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel, and non-attorney employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

177.   **Numerosity**. Plaintiffs are informed and believe that there are tens of thousands or potentially millions of members of the Class. The Class is so large that the joinder of all of its members is impracticable. The exact number of members of the class can be determined from information in the possession and control of Greystar.

178.   **Commonality**. Greystar has acted or refused to act on grounds that apply generally to the Class. Absent certification of the Class, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Greystar. Numerous common issues of fact and law exist, including, without limitation:

a.   Whether Greystar is a "person" within the meaning of Section 1761(c).

b.   Whether Plaintiffs are "consumers" within the meaning of Section 1761(d).

c.   Whether Greystar's Junk Fee practices violate Section 1770(a)(29)(A), which prohibits "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges."

-33-

d.  Whether Greystar's Junk Fee practices violate Section 1770(a)(9), which prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

e.  Whether Greystar's Junk Fee practices violate any other provisions of the CLRA.

f.  Whether Greystar's Junk Fee practices violate the UCL and/or the FAL.

g.  Whether Greystar is liable for unjust enrichment.

h.  Whether Greystar is liable for its pre-July 1, 2024 conduct under the CLRA, the UCL, FAL, and/or common law unjust enrichment.

i.  Whether Greystar makes standardized representations to consumers.

j.  Whether Greystar uses standardized contracts.

k.  Whether Greystar charges standardized Junk Fees to consumers.

l.  The dates of Greystar's practices and any purported changes to those practices.

179.  **Predominance.** These common issues predominate over individualized inquiries in this action because Greystar's liability can be established as to all members of the Class as discussed herein.

180.  **Typicality.** Plaintiffs' claims against Greystar and experience with Greystar are typical, if not identical, to the claims and experiences of members of the Class because, among other reasons, Plaintiffs' claims arise from Greystar's practices that are applicable to the entire Class.

181.  **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class

lost money by paying Junk Fees to Greystar. Plaintiffs also have no interests antagonistic to those of the Class, and Greystar has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

182. **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to recover damages; the damages suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have legal recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiffs and their counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

183. Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## VI. CAUSES OF ACTION

### A. First Cause of Action: Violation of California's Consumer Legal Remedies Act, California Civil Code §§ 1750, *et seq.,* on Behalf of Plaintiffs and the Class.

184. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 183, inclusive, of this Complaint.

185. At all relevant times, Plaintiffs and Class were "consumers" within the meaning of the CLRA, as they were individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

186. Greystar's actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA, namely the

selling of apartment rentals and charging mandatory Junk Fees that exceeded the price initially advertised and/or displayed to consumers.

187. Greystar violated the CLRA by, among other things, making materially false statements and omitting truthful information about the Junk Fees charged to Plaintiffs and the Class.

188. Specifically, Greystar violated Section 1770(a)(9), which prohibits "[a]dvertising goods or services with intent not to sell them as advertised" and Section 1770(a)(29)(A), which prohibits "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges."

189. Additionally, Greystar violated the CLRA by:

    a. "Representing that goods or services have . . . characteristics . . . that they do not have" (a)(5);

    b. "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

    c. "Advertising that a product is being offered at a specific price plus a specific percentage of that price unless (A) the total price is set forth in the advertisement, which may include, but is not limited to, shelf tags, displays, and media advertising, in a size larger than any other price in that advertisement, and (B) the specific price plus a specific percentage of that price represents a markup from the seller's costs or from the wholesale price of the product" (a)(20); and

190. Greystar's actions and misrepresentations were material, and Greystar's violations of the CLRA were a substantial factor in causing Plaintiffs and the Class to incur the Junk Fee charges.

191. As a direct and proximate consequence of these actions, Plaintiffs and the Class suffered injury.

-36-

192.   Greystar's conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiffs and the Class for Defendants' own benefits to the detriment of Plaintiffs and the Class.

193.   At this time, Plaintiffs only seek injunctive and declaratory relief for their CLRA cause of action.[31]

**B.   Second Cause of Action: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, on Behalf of Plaintiffs and the Class.**

194.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 228, inclusive, of this Complaint.

195.   Greystar, Plaintiffs, and Class are "persons" within the meaning of the UCL.

196.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actional.

197.   Greystar's practices of charging Junk Fees are "unlawful" within the meaning of the UCL because, among other things, those Junk Fees violate the CLRA, with Section 1770(a)(9) prohibiting "[a]dvertising goods or services with intent not to sell them as advertised" and Section 1770(a)29(A) prohibiting "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges."

198.   The Junk Fees further are also unlawful within the meaning of the UCL because they violate the False Advertising Act (as detailed in the Third Cause of Action, below) and also violate the FTC Act, as alleged in Paragraphs above.

199.   The acts and practices of Greystar as alleged herein also constitute "unfair" business acts and practices under the UCL because Greystar's conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or

---

[31] Pursuant to Section 1782(d) of the CLRA, Plaintiffs expressly reserve their right to amend their CLRA cause of action to add claims for monetary relief, including, without limitation, for actual, punitive, and statutory damages, at least 30 days after providing Greystar the notice contemplated by Section 1782(a).

unscrupulous. Further, the gravity of Greystar's conduct outweighs any conceivable benefit of such conduct.

200.   Greystar  has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into paying Junk Fees by failing to display those prices in the initially advertised prices.

201.   Greystar has, in the course of business and in the course of trade or commerce, charged these unlawful Junk Fees to Plaintiffs and the Class.

202.   Plaintiffs and the Class have suffered injury in fact—in the form of Junk Fees—and have lost money as a result of Greystar's unlawful business acts and practices and will continue to lose money and be injured by those acts and practices if the practices are not enjoined.

203.   Plaintiffs and the Class seek an order providing restitution and disgorgement of all Junk Fees paid to Greystar.

204.   Plaintiffs and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiffs and the Class seek to enforce "an important right affecting the public interest" in bringing this cause of action.

**C.   Third Cause of Action: Violation of California's False Advertising Law, Cal. Civ. Code §§ 17500 *et seq.,* on Behalf of Plaintiffs and the Class.**

205.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 183, inclusive, of this Complaint.

206.   In violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.,* Greystar's advertisements, policies, acts, and practices described in this Complaint were designed to cause Plaintiffs and the Class to pay Junk Fees to Greystar, and did in fact result in Plaintiffs and the Class paying unlawful Junk Fees to Greystar.

207.  Greystar knew or reasonably should have known that representations on its apartment rental interface were false and deceptive.

208.  Specifically, as alleged in this Complaint, Greystar's unfair, unconscionable, deceptive acts, practices, omissions, and/or affirmative misstatements include, but are not limited to displaying and advertising an initial price for which a consumer could not actually complete the transaction.

209.  As a result, Plaintiffs and the Class, as well as the general public, are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Greystar was unjustly enriched.

210.  Plaintiffs and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiffs and the Class seek to enforce "an important right affecting the public interest" in bringing this cause of action.

**D.  Fourth Cause of Action: Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing on Behalf of Plaintiffs and the Class.**

211.  Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 183, inclusive, of this Complaint.

212.  Plaintiffs and Greystar have contracted for the lease of a rental apartment.

213.  Greystar mischaracterized in the contract its true Junk Fee practices and breached the terms of the contract.

214.  Under California law, the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Good faith is also mandated by the Uniform Commercial Code ("UCC"), which covers rental transactions.

215.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving

the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

216.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

217.   Under lease, Greystar has the ability to determine which charges get billed in any particular month and the manner by which those charges will be pursued.

218.   Greystar has also abused its discretion by grossly overcharging for its actual costs for utility administration. Further, only Greystar knows its actual costs, and by turning the Utility Admin Fees and other Junk Fees into profit centers Greystar makes it more difficult for tenants to make rent and enjoy their residences.

219.   Greystar has breached the covenant of good faith and fair dealing through its Junk Fee policies and practices as alleged herein.

220.   Greystar harms consumers by abusing its contractual discretion in a number of ways that no reasonable customer could anticipate.

221.   Plaintiffs and members of the Class have performed all, or substantially all, of the obligations imposed on them by the contract.

222.   Plaintiffs and members of the Class have sustained damages as a result of Defendants' breach of the contract and breach of the covenant of good faith and fair dealing.

**E.    Fifth Cause of Action: Unjust Enrichment, on Behalf of Plaintiffs and the Class.**

223.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 183, inclusive, of this Complaint.

224.   To the detriment of Plaintiffs and the Class, Greystar has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

225.   Plaintiffs and the Class conferred a benefit on Greystar when they paid Greystar the Utility Admin Fee, which was charged in contravention of applicable law, and which they could not reasonably avoid.

226.   Greystar unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Greystar to retain.

227.   Greystar's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

228.   Plaintiffs and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Greystar as a result of its inequitable conduct as more fully stated herein.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class members of the Class seek an Order:

A.    Certifying the proposed Class pursuant to Rule 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.    Declaring that Greystar is financially responsible for notifying the Class members of the pendency of this suit;

C.    Declaring the Greystar has committed the violations of law alleged herein;

D.    Providing for any and all injunctive relief the Court deems appropriate;

E.    Awarding statutory damages in the maximum amount for which the law provides;

F.    Awarding monetary damages, including but not limited to any

1    compensatory, incidental, or consequential damages in an amount that the Court or

2    jury will determine, in accordance with applicable law;

3         G.    Providing for any and all equitable monetary relief the Court deems

4    appropriate;

5         H.    Awarding punitive or exemplary damages in accordance with proof and

6    in an amount consistent with applicable precedent;

7         I.    Awarding Plaintiffs their reasonable costs and expenses of suit,

8    including attorney's fees;

9         J.    Awarding pre- and post-judgement interest to extent the law allows; and

10        K.    Providing such further relief as this Court may deem just and proper.

11

12   Respectfully submitted,

13   Dated: April 29, 2025                    CUTTER LAW P.C.

14

15                                            */s/ Wesley M. Griffith*
                                             Wesley M. Griffith, SBN 286390
16                                           CUTTER LAW P.C.
                                             401 Watt Avenue
17                                           Sacramento, CA 95864
                                             Telephone: (916) 290-9400
18                                           Facsimile: (916) 588-9330
                                             E-mail: wgriffith@cutterlaw.com
19
                                             F. Peter Silva II, SBN 348070
20                                           David A. McGee (*pro hac vice* to be filed)
                                             TYCKO & ZAVAREEI LLP
21                                           2000 Pennsylvania Avenue, NW, Suite
                                             1010
22                                           Washington, District of Columbia 20006
                                             Telephone: (202) 973-0900
23                                           Facsimile: (202) 973-0950
                                             E-mail: psilva@tzlegal.com
24                                                   dmcgee@tzlegal.com

25                                           Jeffrey Newsome (*pro hac vice* to be filed)
                                             VARNELL & WARWICK
26                                           400 N. Ashley Drive, Suite 1900
                                             Tampa, Florida 33602
27                                           Telephone: (352) 753-8600
                                             Facsimile: (352) 504-3301
28                                           E-mail: jnewsome@vandwlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands a trial by jury of Plaintiffs' and Class Members' claims against Greystar.

Respectfully submitted,

Dated: April 29, 2025                    CUTTER LAW P.C.

*/s/ Wesley M. Griffith*
Wesley M. Griffith, SBN 286390
CUTTER LAW P.C.
401 Watt Avenue
Sacramento, CA 95864
Telephone: (916) 290-9400
Facsimile: (916) 588-9330
E-mail: wgriffith@cutterlaw.com

F. Peter Silva II, SBN 348070
David A. McGee (*pro hac vice* to be filed)
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
E-mail: psilva@tzlegal.com
         dmcgee@tzlegal.com

Jeffrey Newsome (*pro hac vice* to be filed)
VARNELL & WARWICK
400 N. Ashley Drive, Suite 1900
Tampa, Florida 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
E-mail: jnewsome@vandwlaw.com

CLASS ACTION COMPLAINT